# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| MARIA M. RODRIGUEZ, Plaintiff | : : : | CIVIL ACTION |
| v. | : : : | NO. 04-5375 |
| JO ANNE BARNHART, Commissioner of Social Security, Defendant | : : : : | |

## Memorandum and Order

YOHN, J.                                                      September ___, 2005

Plaintiff Maria Rodriguez appeals the final decision of the Commissioner of Social

Security ("the Commissioner") denying her claim for supplemental security income ("SSI")

under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. § 1381-1383f.  Rodriguez and

the Commissioner have filed cross motions for summary judgment.  I referred the motions to

Magistrate Judge Charles B. Smith, who submitted a report and recommendation that I grant the

Commissioner's motion and affirm the Commissioner's decision.  Rodriguez has filed objections

to the report and recommendation.  For the following reasons, the court will adopt the magistrate

judge's report and recommendation and will grant the Commissioner's motion for summary

judgment

## I. Factual Background

At the time of the ALJ's decision, plaintiff Maria Rodriguez was 43 years old.  (R. 57).

She has a seventh grade education and no prior relevant work experience.  (R. 63, 68).  She lives

with her six youngest children, ranging in ages from five to fourteen.  (R. 195).

Rodriguez alleges that she became disabled on January 1, 2002, due to depression and

bad nerves.  (R. 57-59, 62).  However, her treatment notes date back to August 8, 2000, at which

date she underwent a psychiatric evaluation at the Mental Health Clinic at Asociación De

Puertrriqueños En Marcha, Inc. ("APM").  (R. 103-105).  Psychiatrist Richard Mufson, M.D.

completed the evaluation, first noting that Rodriguez had a history of drug and alcohol abuse.

(R. 103).  He concluded that Rodriguez's thought processes were logical, cogent, and goal

directed, and that her affect and speech were normal, but that her mood was depressed.  (R. 102).

Dr. Mufson diagnosed Rodriguez with major depression and assigned her a GAF score of 50.[1]

(R. 105).  He prescribed Prozac and Buspar.  (R. 97).

After this evaluation, Rodriguez began a regimen at APM that included psychiatric

treatment with Dr. Mufson and regular sessions of psychotherapy.  Psychiatric notes for the

remainder of 2000 reveal that Rodriguez felt better and responded well to her medications.  (R.

95).

Rodriguez maintained this improved health throughout the first half of 2001.  From

March to August, Dr. Mufson noted that Rodriguez was doing well on the Prozac.  (R. 93-94).

---

[1] The GAF scale is a method of measuring the level of psychological, social, and occupational functioning on a hypothetical continuum of mental health. The GAF scale ranges from 0 to 100, with some impairment in reality testing or communication at a score between 31 and 40, serious impairment in functioning at a score between 41 and 50, moderate difficulty in functioning between 51 and 60, some difficulty in functioning between 61 and 70, and no more than slight impairment in functioning between 71 and 80. Superior functioning is represented by a score between 91 and 100. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).

However, in August of 2001, psychotherapy notes reported that Rodriguez began to have trouble sleeping and experience anxiety. (R. 165). The same report noted that Rodriguez felt very concerned about her children. (R. 165). This is the first of many times that the psychotherapy notes appear inconsistent with the psychiatric notes. In September and October of 2001, Rodriguez's psychotherapy notes described her as feeling paranoid that someone would break into her home and suffering from insomnia. (R. 166). She also reported feeling anxious, fearful, depressed, overwhelmed, frustrated, and unable to concentrate. (R. 166). In November, Dr. Mufson reported that Rodriguez suffered from apprehension and fear, and that her children were upsetting her. (R. 93).

In January of 2002, at the onset of Rodriguez's claimed disability, her psychotherapy notes reported that she was feeling overwhelmed, depressed, fearful, anxious, and unable to sleep. (R. 167-68). Also in January, in response to her complaints of depression, Dr. Mufson started Rodriguez on Paxil. (R. 91). In February, psychotherapy notes reported that she continued to suffer from depression and insomnia, that she had poor eye contact and low energy, and that her attire was inappropriate because she wore bedroom slippers to the appointment. (R. 168).

On February 6, 2002, Rodriguez underwent a consultive examination with state disability physician John P. Kohler, M.D. (R. 126-29). He diagnosed her with anxiety and depression with elements of obsessive compulsive disorder, with a prior history of drug and alcohol abuse. (R. 129). He did not make any observations about Rodriguez's ability or inability to perform work-related activities.

In March, Rodriguez's psychotherapy notes reported that she was fearful that she had

3

contracted HIV, felt very depressed, had lost 16 pounds, suffered from low energy and crying spells, and was socially withdrawn.  (R. 169).  However, also in March, Rodriguez told Dr. Mufson that she was feeling better with her Paxil.  (R. 91).  In April and May, she told her psychotherapist that she was experiencing less anxiety and fewer delusional thoughts, but she remained very depressed and restless, and displayed intermittent eye contact and pressured speech.  (R. 170).

On June 6, 2002, Rodriguez underwent a second psychiatric evaluation by Dr. Mufson. (R. 100-02).  She reported that her condition had improved since the start of her treatment at APM.  (R. 100).  At the same time, she complained of feeling nervous, suffering from insomnia, and feeling "down all the time."  (R. 100).  Dr. Mufson reported that Rodriguez was pleasant, cooperative, spontaneous, coherent, logical, and appropriate, with intact insight and judgment. (R. 101-02).  He also noted that her affect was within normal range but was labile and constricted.  (R. 101).  Dr. Mufson diagnosed her with dysthymia and reassigned her a GAF score of 50.  (R. 102).

In psychotherapy notes spanning from June to September of 2002, Rodriguez reported feeling depressed and concerned about her past reckless behavior.  (R. 171-72).  She continued to exhibit pressured speech and restless behavior.  (R. 171).

Through the end of 2002, Rodriguez continued to praise her medicine to Dr. Mufson while voicing concerns about impairments to her psychotherapist.  For example, in a July 2002 treatment note, Dr. Mufson reported that Rodriguez found her medicine to be fine.  (R. 92). Then, in an August psychotherapy note, Rodriguez reported feeling anxious and depressed.  (R. 172).  In a September psychiatric note, she again approved of her medicine, saying "I want the

same medicine, it's good." (R. 92). But in October psychotherapy notes, Rodriguez reported feeling easily overwhelmed, while suffering from excessive anxiety and increased depression. (R. 172). Also, the psychotherapist continued to observe restless behavior and pressured speech. (R. 172). This was confirmed in a November 2002 treatment note, in which Dr. Mufson reported that Rodriguez felt anxious and showed traits that were suggestive of obsessive compulsive disorder. (R. 92). However, in December, Dr. Mufson commented that Rodriguez was doing very well with her prescriptions, with no complaints. (R. 90). Yet in November and December psychotherapy notes, Rodriguez reported that she continued to suffer from obsessive thoughts concerning past reckless behavior and experienced increased depression. (R. 173). The psychotherapist also noted that Rodriguez demonstrated pressured speech and restlessness. (R. 173).

Rodriguez continued to attend psychiatric and psychotherapy sessions in 2003. In January of 2003, she told Dr. Mufson that she felt okay and that she had no problems with her medication. (R. 90). However, in psychotherapy sessions, she noted that her anger was increasing, and that she was suffering from excessive anxiety, frequent depressive symptoms, restlessness, and insomnia. (R. 174). She also exhibited slow speech and lethargic behavior. (R. 174). February psychotherapy notes reported that she suffered from excessive anger, anxiety triggered by family stressors, and showed angry facial expressions. (R. 174-75). In psychotherapy notes from March and April, Rodriguez continued to report that she was experiencing explosive anger and extreme depression. (R. 175-76).

State physician J.J. Kowalski, M.D. completed a Psychiatric Review Technique on April

2, 2003 after reviewing some of Rodriguez's records.[2]  (R. 138-151).  He diagnosed her with

dysthymia.[3]  (R. 141).  Based on this diagnosis, he concluded that her activities of daily living

("ADLs") were mildly limited, while her ability to maintain social functioning and ability to

maintain concentration, persistence, or pace were moderately limited.  (R. 148).  He determined

that Rodriguez's allegations were partly credible, but that they did not significantly limit her

functioning.  (R. 150).  On the same date, Dr. Kowalski also completed a Mental Residual

Functional Capacity Assessment.  (R. 152-55).  In this assessment, he found that Rodriguez

suffered from some moderate limitations,[4] but generally was not significantly limited[5] in her

---

[2] Rodriguez's psychotherapy notes were submitted at the time of her administrative hearing; accordingly, Dr. Kowalski had access to none of the psychotherapy notes and only those of Dr. Mufson's notes and assessments that were completed before April 2, 2003.

[3] "Dysthymia" is defined as "a chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness." *Stedman's Medical Dictionary* 556 (27th ed. 2000).

[4] Dr. Kowalski found that Rodriguez was moderately limited in her ability to: carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and respond appropriately to changes in the work setting.  (R. 152-53)

[5] Dr. Kowalski found that Rodriguez was not significantly limited in her ability to: understand and remember detailed instructions; carry out very short and simple instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; set realistic goals or make plans independently of

work-related capacity.  (R. 152-53).

In May and June psychotherapy notes, Rodriguez continued to complain of uncontrollable depression and extreme anger.  (R. 175-76).  Those notes also indicate that her mood was pessimistic, her judgment was poor, and she complained of escalating family conflict.  (R. 175-76).  However, in July and August, Dr. Mufson found Rodriguez to be alert, well-oriented, of clear speech, and cognitively intact.  (R. 161, 162).  Still, he also found that she was stressed due to raising six children and having her youngest start kindergarten.  (R. 160).  Her psychotherapy notes from August and September indicated that she continued to suffer from anger, depression, and excessive anxiety.  (R. 178).  Her mood was unstable, her speech was lethargic, and her judgment was poor.  (R. 178).

On August 12, 2003, Dr. Mufson completed a Medical Assessment of Ability to Do Work Related Activities ("assessment").  (R. 156-58).  He rated as "poor to none" Rodriguez's ability to follow work rules; relate to co-workers; use judgment; interact with supervisors; deal with work stress; understand, remember, and carry out complex or detailed job instructions; and relate predictably in social situations.  (R. 156-58).  He rated as "fair" her ability to deal with the public; function independently; maintain attention/concentration; understand, remember and carry out simple job instructions; behave in an emotionally stable manner; and demonstrate reliability.  (R. 156-58).  His only explanation of these findings was a diagnosis of "dysthymic disorder" and the identification of the limitations of "poor memory" and "poor comprehension."  (R. 157).  Dr. Mufson also found that Rodriguez was capable of managing her own benefits.  (R. 158).

_____

others.  (R. 152-53).

## II. Procedural Background

On November 26, 2002, Rodriguez applied for SSI.  (R. 57-59).  She alleged disability beginning on January 1, 2002, due to depression and bad nerves.  (R. 57, 62).  The state agency denied the application initially on April 25, 2003.  (R. 37-40).

Rodriguez had an administrative hearing on October 20, 2003.  (R. 189).  She appeared, testified, and was represented by a lawyer.  (R. 191-208).  In this hearing, Rodriguez testified to living with her six children, and noted that her medicine helped to calm her.  (R. 195-96).  She also noted that: she was able to walk a block and a half to reach APM, she occasionally took public transportation to reach her welfare office and lawyer's office, she experienced difficultly being around groups of people, and she was constantly in fear that something bad would happen to her or her family.  (R. 196-98).  Rodriguez described her typical day as involving waking up her children for school; occasionally cooking, cleaning or doing laundry; and playing with her dogs.  (R. 199-201).  She indicated that she never shopped or paid her bills; for those tasks, she received help from a grown-up daughter who does not live with her.  (R. 202).  A vocational expert ("VE") appeared and testified.  (R. 205-06).  In response to the ALJ's hypothetical question about whether jobs existed in the national economy for an individual who was "limited to just simple, routine tasks with not more than occasional contact with supervisors or fellow employees and no contact with the general public," the VE identified the unskilled jobs of industrial cleaner, coin machine operator, assembler, and bench assembler.  (R. 205-06).  Alternatively, the VE testified that an individual possessing the limitations identified in Dr. Mufson's assessment would be unable to work.  (R. 206-07).

In a thorough October 31, 2003 opinion, the ALJ found that Rodriguez was not disabled. (R. 23-32). He concluded that her mental impairments did amount to a severe impairment, but did not meet any of the listings set out in 20 C.F.R. Pt. 404 , Subpt. P, App. 1. (R. 24-26). In determining Rodriguez's residual functional capacity ("RFC"), he concluded that her assertions were exaggerated and of only fair credibility concerning the intensity, persistence, and limiting effects of her impairments. (R. 28-29). The ALJ also decided to grant little weight to the opinion of Rodriguez's treating physician, Dr. Mufson, noting:

> Dr. Mufson appears to be basing his assessment primarily . . . upon claimant's assertions and complaints; that he provided no objective clinical, diagnostic or laboratory findings to support the degree of limitations assessed; that he failed to offer any indication or description of the precise medical observations utilized to form the basis of his assessment; that he cited the existence of specific medically determinable disorders, but offered no specific rationale for his functional assessment, so that it is impossible to discern how the documentary evidence gave rise to his ultimate opinion; that he failed to provide any detailed description of claimant's psychosocial history, any diagnostic test results, any specific instances describing the claimant's inability to interact with other people, or any specific occurrences utilized as an example of the claimant's poor attention or concentration; that his assessment is inconsistent with specific medical findings and/or observations made elsewhere in the record . . . ; that his assessment is not supported by reports which indicate only routine, conservative outpatient care; and that his assessment is inconsistent with claimant's self-reported activities of daily living.

(R. 29). The ALJ accorded greater weight to Dr. Kowalski's assessment of Rodriguez. (R. 29). Finally, he found that Rodriguez had no medically determinable exertional or other physical limitations, but that her "capacity for work [was] diminished by an inability to perform occupational activities involving more than simple, routine tasks, with no more than occasional contact with supervisors and fellow employees, and no contact with the general public." (R. 30). Accordingly, he determined that she was able to work as an industrial cleaner, coin machine operator, assembler, or bench assembler, which compelled a finding of "not disabled." (R. 31).

9

On September 21, 2004, the Appeals Council denied Rodriguez's request for review.  (R. 4-7).  Accordingly, the ALJ's decision is the final decision of the Commissioner.  On November 17, 2004, Rodriguez filed a complaint in this court seeking judicial review of the Commissioner's decision.  On March 30, 2004, she filed a motion for summary judgment, requesting reversal of the ALJ's decision.  The Commissioner filed a cross motion for summary judgment.

On May 4, 2005, the case was referred to the magistrate judge for a report and recommendation.  On May 31, 2005, the magistrate judge recommended that Rodriguez's motion for summary judgment be denied and the Commissioner's motion for summary judgment be granted.

On June 17, 2005, Rodriguez filed objections to the report and recommendation, challenging the magistrate judge's determinations that: 1) substantial evidence supported the ALJ's decision to assign little weight to the opinion of treating physician Dr. Mufson, and 2) substantial evidence supported the ALJ's determination that her subjective complaints were of only fair credibility.

## III. Standards of Review

I review *de novo* the parts of the magistrate judge's report to which Rodriguez objects. 28 U.S.C. § 636(b)(1)(C).  I may accept, reject, or modify, in whole or in part, the magistrate's findings or recommendations.  *Id.*

In contrast, a district court may not review the Commissioner's decision *de novo*.  The court may only review the Commissioner's final decision to determine "whether that decision is

supported by substantial evidence." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (citing

42 U.S.C. § 405(g)).   "[S]ubstantial evidence is more than a mere scintilla." *Universal Camera*

*Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (internal quotation omitted).   "Substantial evidence

'does not mean a large or considerable amount of evidence, but rather such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'"   *Hartranft*, 181 F.3d at 360

(quoting *Pierce v. Underwood*, 487 U.S. 552 (1988)).   In making this determination, the court

must consider "the evidentiary record as a whole, not just the evidence that is consistent with the

agency's finding." *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986) (citations

omitted).   The substantial evidence test is "deferential." *Id.*   Consequently, the court "will not set

the Commissioner's decision aside if it is supported by substantial evidence, even if [it] would

have decided the factual inquiry differently." *Hartranft*, 181 F.3d at 360.

**IV. Discussion**

   *A. Introduction*

   To qualify for SSI payments, a claimant must demonstrate that "there exists a medically

determinable basis for an impairment that prevents him from engaging in any 'substantial gainful

activity' for a statutory twelve-month period." *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir.

1987) (citations omitted).   When evaluating a claim for SSI disability payments, the

Commissioner applies a five-step sequential analysis.   20 C.F.R. § 416.920; *Sykes v. Apfel*, 228

F.3d 259, 262-63 (3d Cir. 2000).   The Commissioner considers: (1) whether the claimant worked

during the alleged period of disability; (2) whether the claimant has a "severe medically

determinable . . . impairment"; (3) whether the "impairment" meets the requirements of a listed

11

impairment; (4) whether the claimant can continue to perform "past relevant work"; and (5) whether the claimant can perform "other work" in the national economy.  20 C.F.R. § 416.920(a)(4).  The claimant bears the burden of proving steps one through four.[6]  If the claimant satisfies these requirements, the burden shifts to the Commissioner to show that the claimant is capable of performing "other work."  *Sykes*, 228 F.3d at 263.

Here, Rodriguez has filed two objections to the magistrate judge's recommendation. First, she contends that the magistrate judge mistakenly upheld the ALJ's decision to accord Dr. Mufson's opinion "limited weight."  Second, Rodriguez argues that the magistrate judge erred in upholding the ALJ's determination that her subjective complaints were only "fairly credible." For these two points, she argues that the ALJ's reasoning is not supported by substantial evidence.

### B. The ALJ's decision to accord limited weight to the treating physician's opinion

Rodriguez argues that the ALJ erred in according limited weight to an assessment completed by her treating physician, Dr. Mufson, which identified an array of serious, work-preclusive limitations.  She offers two sub-arguments in support of this claim, asserting that: 1) Dr. Mufson's opinion is supported by the evidence in the record, including the psychotherapy notes, and 2) the ALJ should have sought more evidence from Dr. Mufson if he found that the doctor's assessment inadequately explained its conclusions.  However, neither of these arguments has merit.

By way of background, "[t]reating physicians' reports should be accorded great weight,

---

[6] Technically, neither party bears the burden of proving step three "[b]ecause step three involves a conclusive presumption based on the listings."  *Sykes v. Apfel*, 228 F.3d at 263 n.2.

especially 'when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time.'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987)).  The regulations provide that treating physician opinions will be granted controlling weight where they are well-supported by medical evidence and not inconsistent with other substantial evidence in the record.  20 C.F.R. § 416.927(d)(2).  "An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." *Plummer*, 186 F.3d at 429 (citing *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985)). Where the opinion of a treating physician conflicts with that of a non-treating physician, the ALJ may "choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Id.* (quoting *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)).

   *1. Rodriguez's argument that Dr. Mufon's opinion is consistent with psychotherapy notes*

   Rodriguez first argues that Dr. Mufson's assessment is consistent with and based on the psychotherapy notes.  However, even if this argument is accepted, the ALJ's decision to accord Dr. Mufson's opinion limited weight will still be supported by substantial evidence, because: 1) Dr. Mufson's assessment remains inconsistent with the rest of the record, and 2) the psychotherapy notes are of limited value because they largely recite only Rodriguez's claims of her subjective symptoms.[7]

---

   [7] Indeed, this entire line of argument is based on Rodriguez's conjecture, because Dr. Mufson did not indicate whether he actually did consider the psychotherapy notes in reaching his conclusions.  However, for the purpose of this discussion, I will accept this theory despite its limited support.

Most importantly, this argument does not change the fact that the objective evidence, such as Rodriguez's treatment history and her self-reported activities of daily living ("ADLs"), stands in opposition to Dr. Mufson's conclusions.[8] To elaborate, Rodriguez's treatment regimen consists of conservative outpatient care, in which she visits Dr. Mufson only once every two months and the psychotherapist only once every two weeks. She has also never been hospitalized due to her condition. The ALJ correctly noted that this pattern is inconsistent with complete disability. Additionally, Dr. Mufson's opinion is inconsistent with Rodriguez's self-reported ability to perform ADLs. Rodriguez testified that she is the primary care-giver for six children, whom she wakes up for school each morning. She explained that she spends her days playing with her dogs and occasionally cleaning or doing laundry. Also, she described an ability to take public transportation to reach appointments. These abilities and responsibilities appear inconsistent with Dr. Mufson's conclusions, particularly his determination that Rodriguez had a poor to absent ability to use judgment.

Also, Dr. Mufson's opinion is inconsistent with that of Dr. Kowalski, the only other physician to examine the record. Dr. Kowalski found that Rodriguez suffered from some moderate limitations, but was not significantly limited in her work-related capacity. While Dr.

---

[8] Rodriguez argues that Dr. Mufson's assessment is actually not inconsistent with the remainder of the record; rather, the apparent inconsistency is the product of the magistrate judge and the ALJ emphasizing only the assessment's restrictive findings to the detriment of its more positive findings. However, review of the assessment shows that the magistrate judge and the ALJ were correct in noting that it offered exceptionally restrictive conclusions. Dr. Mufson rated Rodriguez's ability to perform eight work-related activities as "poor to none," while finding that she had a "fair" ability to perform six activities and a "good" ability to maintain personal appearance. This means that in eight out of fifteen categories Dr. Mufson assigned Rodriguez the lowest possible rating. The VE testified that an individual possessing those characteristics would be unable to work. Thus, the magistrate judge and the ALJ fairly represented the assessment's conclusions.

Kowalski's opinion is flawed in that he neither considered the psychotherapy notes because they were not available to him nor treated Rodriguez, it provides a much fuller explanation of its conclusions than does Dr. Mufson's assessment. *See* 20 C.F.R. § 419.927(d)(3) (noting "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion"). Also, the opinion of a state consultant, despite coming from a non-treating source, is valuable because "[s]tate agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." 20 C.F.R. § 416.927(f)(2)(I). Thus, Dr. Kowalski's opinion further demonstrates the disparity between Dr. Mufson's assessment and the remainder of the record.

Additionally, Dr. Mufson's reports are internally inconsistent. His treatment notes, with a few exceptions, described Rodriguez as doing "okay" and responding well to her medications. Yet his assessment reported dire limitations. If, as Rodriguez argues, Dr. Mufson had access to Rodriguez's psychotherapy notes for his assessment, presumably he had the same access to those notes prior to his bimonthly treatment sessions. It would actually seem more important that Dr. Mufson consider Rodriguez's psychotherapy notes before meeting with her to consider adjustments to her treatment plan or medication than before completing a checkbox assessment form unrelated to treatment. Thus, even assuming that Dr. Mufson did have access to those therapy notes while completing the assessment, the assessment is inconsistent with his years of treatment notes.

Dr. Mufson's use of GAF scores also hurts his opinion's credibility. In August of 2000, he diagnosed Rodriguez with major depression and assigned a GAF score of 50. Then, after

almost two years of treatment that Rodriguez described as helping her condition, Dr. Mufson reexamined Rodriguez.  This time, he diagnosed her with the less severe condition of dysthymia, yet assigned the identical GAF score.  He did not support or explain his GAF scores, which is emblematic of his general failure to allow for meaningful scrutiny of his conclusions.

Rodriguez's argument is also unpersuasive because the psychotherapy notes, like Dr. Mufson's treatment notes, tend to recite Rodriguez's subjective complaints without providing clinical data.  While the psychotherapy notes contain an even greater quantity of those complaints, sheer quantity does not change character.  Thus, the psychotherapy notes have the same limitation that Dr. Mufson's treatment notes do: they are only as valuable as Rodriguez is credible.  And, as the ALJ determined, Rodriguez is only fairly credible in describing her limitations.  This contrasts with the evidence described above, such as her conservative treatment plan and her ability to perform ADLs, both of which have a more objective foundation.

Accordingly, I find that substantial evidence in the record supports the ALJ's decision to accord limited weight to Dr. Mufson's opinion.

### 2. Rodriguez's argument that the ALJ should have sought more information from Dr. Mufson

Rodriguez also argues that if the ALJ found problems with the clarity or thoroughness of Dr. Mufson's opinion, he should have requested more information from Dr. Mufson before discounting the opinion.  However, the ALJ correctly found that there was sufficient evidence in the record to reach a disability determination, which satisfied his duty under the regulations.

Under 20 C.F.R. § 416.912(e), "[w]hen the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you

16

are disabled, we will need additional information." That concept is elaborated in 20 C.F.R. § 416.912(e)(1), which states:

> [w]e will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.

"[T]he Third Circuit has not explicitly addressed the standard governing when an ALJ is obligated to recontact a treating physician . . . ." *Washington v. Barnhart*, 2005 WL 701802, at *7 (E.D. Pa. March 25, 2005). Most cases in this circuit that have addressed the issue have followed the reasoning of *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) and determined that notwithstanding the deficiencies of a treating physician's opinion, the evidence on the record remained "adequate" to reach a disability determination. *See Kraft v. Barnhart*, 2005 WL 950607, at *4 (E.D. Pa. April 22, 2005) (finding that evidence on the record was adequate to determine disability when three other physicians contradicted the opinion of a treating psychologist); *Washington,* 2005 WL 701802, at *7 (finding that the ALJ did not need to recontact a treating physician "because the record was adequate to determine that the Plaintiff was not disabled"); *Simmons v. Barnhart*, 2004 WL 2323776, at *6 (D. Del. Oct. 12, 2004) (noting "other evidence found in the record was adequate to determine whether Plaintiff was disabled"); *Moody v. Barnhart*, 2003 WL 21640621, at *4 (E.D. Pa. July 11, 2003) (same).

This case is similar to those cited *supra*. The ALJ determined that Dr. Mufson's opinion, besides being improperly documented, was inconsistent with much of the record, including: his own treatment notes, Rodriguez's self-reported ability to perform ADLs, the opinion of consulting physician Dr. Kowalski, and Rodriguez's conservative outpatient treatment program.

This combination of factors provided the ALJ with adequate evidence to determine that

Rodriguez was not disabled, and was sufficient to satisfy his obligation under 20 C.F.R. §

416.912(e).  Consequently, the ALJ was not obligated to request supplemental information from

Dr. Mufson.

   *C. The ALJ's determination that Rodriguez possessed only "fair" credibility*

   Rodriguez next argues that the magistrate judge's and the ALJ's determinations that she

was only fairly credible in describing her subjective complaints were based on a distorted reading

of her administrative testimony that exaggerated her abilities.  However, I find that the ALJ's

opinion accurately portrayed Rodriguez's self-reported abilities, so this finding will be upheld.

   The Third Circuit has created a backdrop against which complaints of subjective pain

must be evaluated, specifically noting:

> (1) that subjective complaints of pain be seriously considered, even where not
> fully confirmed by objective medical evidence; (2) that subjective pain "may
> support a claim for disability benefits," and "may be disabling"; (3) that when
> such complaints are supported by medical evidence, they should be given great
> weight; and finally (4) that where a claimant's testimony as to pain is reasonably
> supported by medical evidence, the ALJ may not discount claimant's pain without
> contrary medical evidence.

*Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985) (citations omitted).

   The regulations also describe a process for assessing subjective complaints.  First, the

ALJ must identify a "medically determinable impairment that could reasonably be expected to

produce [the] symptoms" that the claimant alleges.  20 C.F.R. § 416.929(b).  Then, after the ALJ

identifies that impairment, he or she must "evaluate the intensity and persistence of [the]

symptoms" to determine the degree to which they limit the claimant's capacity to work.  20

C.F.R. § 416.929(c)(1).  Thus, the ALJ is required to "determine the extent to which a claimant is

accurately stating the degree of pain or the extent to which he or she is disabled by it." *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999); *see also* 20 C.F.R. § 416.929(c).  In making these determinations, the ALJ will consider all of the available evidence, including: (1) the claimant's daily activities; (2) the duration, location, frequency, and intensity of the claimant's pain and other symptoms; (3) the claimant's precipitating and aggravating factors; (4) the type, dosage, effectiveness, or side effects of the claimant's medication; (5) the treatment that the claimant receives other than medication; (6) any measures used by the claimant to relieve the symptoms; and (7) other factors concerning functional restrictions or limitations due to pain or other symptoms. 20 C.F.R. §§ 416.929(c)(3)(i)-(vii).

In this case, the ALJ found that Rodriguez had the underlying medically determinable impairments of depression and anxiety, which could reasonably be expected to result in the symptoms that she alleged.  However, he then found that her assertions were only fairly credible, mostly because her complaints of complete disability were inconsistent with her ADLs and stable psychiatric condition.

Rodriguez argues that the ALJ supported his determination that her complaints were of fair credibility by either exaggerating or misinterpreting her level of functioning.  It is unclear whether she believes that the ALJ actually mischaracterized her responses or merely emphasized the wrong portions of her testimony.  However, neither version of the argument is compelling because the ALJ's description of Rodriguez's capacity is entirely consistent with her administrative testimony.

For example, Rodriguez argues that the ALJ's finding that she "helps to get her six children off to school" each morning overstated her responsibilities.  In her administrative

hearing, Rodriguez's specific language regarding this issue was "I will call my kids.  They get ready for school."  (R. 199).  This dispute is entirely speculative; Rodriguez's answer provides insufficient information to disjoin her actions from those of her children.  However, even if Rodriguez's contribution to her children's preparation is limited to waking them up in the morning, that contribution is "help" and is consistent with the ALJ's finding.  Similarly, substantial evidence supports the ALJ's descriptions of Rodriguez's other capabilities, including his findings that she: is the primary care-giver of her children;[9] plays with her five dogs during the day;[10] cooks occasionally, does laundry, and cleans with assistance;[11] takes public transportation at times;[12] and walks to APM.[13]  It was entirely appropriate for the ALJ to determine that the ability to perform those ADLs demonstrated a more advanced level of functioning than would be possible for an individual truly suffering from all of Rodriguez's subjective complaints.

Additionally, to the extent that Rodriguez desires that this court reweigh the evidence and

---

[9] Rodriguez testified to living with her six children, the oldest of whom is fourteen.  (R. 195)  While Rodriguez never used the word "care-giver," the ALJ was justified in attributing that role to the sole adult in a household with six children.

[10] Rodriguez testified that "[w]hen I'm by myself I just play with my dogs."  (R. 200).

[11] Rodriguez testified that she "sometimes" cooks, "sometimes" does laundry, and cleans the house "with [her] kids helping."  (R. 200).

[12] Rodriguez testified that she takes the bus to her welfare office and her lawyer's office.  (R. 196).  While she also indicated that she does not like to take the bus because it makes her "real nervous," (R. 199), the fact that she has taken the bus on multiple occasions makes her complaint seem to more properly describe a dislike than a disability.

[13] In response to the ALJ's question about how Rodriguez got to APM, she responded "walking."  (R. 196).

emphasize different parts of her testimony than the ALJ did, she is limited by this court's role. This court can only review the ALJ's decision to determine whether it is supported by substantial evidence, *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999), and may not reweigh the evidence, *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).  Here, the ALJ's conclusion that Rodriguez's subjective complaints were only fairly credible is supported by substantial evidence and thus will not be disturbed.

**V. Conclusion**

For the above reasons, I will overrule both of Rodriguez's objections to the magistrate judge's report and recommendation. The ALJ's decision is supported by substantial evidence, and consequently, I will grant the Commissioner's motion for summary judgment. An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA


MARIA M. RODRIGUEZ,
Plaintiff

    v.

JO ANNE BARNHART,
Commissioner of Social Security,
Defendant

       :
       :    CIVIL ACTION
       :
       :    NO. 04-5375
       :


## Order

AND NOW, this _____ day of September 2005, upon consideration of the parties' cross-motions for summary judgment (Doc. Nos. 7, 8), and after careful and independent review of the magistrate judge's report and recommendation and the plaintiff's objections thereto, it is hereby ORDERED that:

    1. Plaintiff's objections are OVERRULED.

    2. The Report and Recommendation of United States Magistrate Judge Charles B. Smith is APPROVED and ADOPTED.

    3. The plaintiff's motion for summary judgment is DENIED

    4. The motion of defendant Jo Anne Barnhart, Commissioner of Social Security, for summary judgment is GRANTED.

    5. Judgment is entered affirming the decision of the Commissioner.


_____
William H. Yohn, Jr., J.